IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:14-cr-351 |
| BRYAN CHRISTOPHER SAMUEL, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Defendant's motion to suppress in this drug distribution and firearm prosecution presented the following questions:

(1) Whether police stopped and detained defendant on October 10, 2010 on the basis of reasonable, articulable suspicion pursuant to *Terry v. Ohio*, 392 U.S. 1, 22 (1968), or whether defendant was instead seized and arrested at that time without probable cause.

(2) If reasonable, articulable suspicion existed to support the October 10, 2010 stop, the next question is whether that reasonable suspicion ripened into probable cause warranting defendant's arrest and the search of defendant's person and vehicle that followed incident to the arrest.

A bench ruling issued denying the motion to suppress after full briefing and oral argument. This memorandum opinion records and elucidates that ruling.

I.

On October 21, 2014, a grand jury returned an indictment charging defendant Bryan Christopher Samuel with conspiring to "distribute one hundred grams or more of a mixture and substance containing a detectable amount of heroin," in violation of 21 U.S.C. §§ 841(a)(1) and 846. Thereafter, on December 16, 2014, the grand jury returned a superseding indictment adding

1

an additional count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 942(c)(1)(A).

At a February 2, 2015 hearing on defendant's motion to suppress, the government presented testimony from Manassas Police Department ("MPD") Officers Heather Munsterman and Russell McAndrews, who were involved in the events of October 10, 2010. In addition to the testimony of the two officers, the government introduced one exhibit: the MPD's event report describing the tipster's call that instigated the events of October 10 and the department's subsequent response. The officers' testimony was credible and reliable, convincingly establishing the following facts[1]:

- The MPD received a call at 9:45 p.m. on October 10, 2010 from Connie Grieve, who stated she was located at an Exxon gas station at 9901 Wellington Road and was observing two individuals who appeared to be selling narcotics out of a black Jeep Cherokee parked behind the station. Gov't Ex. 1. The MPD relayed this information over the police radio system and dispatched officers to respond. Hearing Tr. at 26, 29.

- Officer Munsterman, who at the time had worked as a police officer for the MPD for about five years, was the first to arrive at the Wellington Road Exxon station at approximately 9:49 p.m. *Id.* at 22, 26; Gov't Ex. 1.

- Officer Munsterman was familiar with the Wellington Road Exxon because she had responded to "a hundred-plus" calls related to crimes in that area over the course of her career. Hearing Transcript at 32. Both she and Officer McAndrews, a canine handler who also responded to the dispatch, characterized the Exxon station and surrounding neighborhood as a "[h]igh crime area." *Id.* at 33, 72.

- When Officer Munsterman arrived at the Exxon station in her marked police vehicle, she observed a black Jeep Cherokee

---

[1] The ultimate burden of proof on a motion to suppress is on the government to prove facts by a preponderance of the evidence establishing that a government action is consistent with the Constitution. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

2

parked backwards in a parking spot behind the Exxon station in the manner described by the tipster and reported in the MPD radio dispatch. *Id.* at 33. As she approached the Jeep Cherokee, the individual in the passenger's seat of the vehicle suddenly emerged from the vehicle and fled. *Id.* at 34. The driver—whom Officer Munsterman identified in court as defendant—remained in the vehicle. *Id.*

- After observing the passenger fleeing the scene, Officer Munsterman put her police cruiser in park and approached the Jeep Cherokee with her gun drawn. *Id.* She asked defendant to show his hands and he complied. *Id.* at 34-36. She then called for additional units and when more officers promptly arrived defendant was placed in handcuffs. *Id.* at 35.

- A canine unit consisting of Officer McAndrews and his canine partner Mako arrived approximately one to four minutes later. *Id.* at 37; Gov't Ex. 1. At the time of these events, Officer McAndrews had been employed with the MPD for about five years. He and Mako had been a certified canine team since their graduation from canine handlers' school in 2009. Hearing Transcript at 60, 62.

- Mako was trained to detect nine different narcotic odors, including marijuana and heroin. *Id.* at 65-66. As a canine team certified by the Virginia Police Canine Association, Mako had to demonstrate an approximately 92% accuracy rate in training. *Id.* at 65. Further, Officer McAndrews testified that Mako had a zero percent error rate in the field, meaning that he "never saw any condition or situation where [Mako's alert] appeared to be inaccurate or misbehaving at all in the field." *Id.* at 65. Officer McAndrews and Mako trained weekly in addition to working and training in the field. *Id.* at 64.

- At the scene, after conducting a safety check of the Jeep Cherokee and the area surrounding it, Officer McAndrews directed Mako to the vehicle and began walking him around it in a counterclockwise pattern. *Id.* at 73-76. When they reached the driver's side door, Mako "alerted" to the odor of narcotics by squaring his body to the vehicle, pressing his nose onto the driver's side door handle, and scratching at the door. *Id.* at 76.

- After Mako's alert, Officer McAndrews opened the car door and put Mako inside the vehicle, where the dog indicated through certain behavioral changes that he had detected a narcotic odor in the vehicle. *Id.* at 77. Mako alerted to the

3

driver's side floor mat, the front dashboard, and the center console armrest as well. *Id.* at 77-78.

- Thereafter, Officer McAndrews told Officer Munsterman where Mako had alerted in the vehicle. *Id.* at 79. Officer Munsterman then conducted a search of the vehicle and found a white powdery substance packaged in about forty small Ziploc baggies contained within another, larger Ziploc baggie under the driver's side mat. *Id.* at 39-40. Based on her training and experience, Officer Munsterman believed that the substance therein was narcotics. This was confirmed by a field test on the powder which tested positive for heroin. *Id.* 40-41.

- After the positive test, Officer Munsterman placed defendant under arrest and conducted a search of his person. *Id.* at 41. In defendant's pocket, Officer Munsterman found small Ziploc baggies containing what she believed to be narcotics and $218 in cash. *Id.* at 41-42, 58.

Defendant moved to suppress the evidence recovered in the course of this search on the ground (i) that Officer Munsterman effectively arrested defendant without probable cause when she approached his vehicle with her gun drawn, or, alternatively, (ii) that if the stop did not constitute an arrest, Officer Munsterman lacked even the reasonable, articulable suspicion necessary to support an investigatory stop pursuant to *Terry v. Ohio*. Of course, if the stop was not supported in that fashion then the evidence obtained thereby would be fruit of the poisonous tree and subject to suppression. *See United States v. Calandra*, 414 U.S. 338, 347 (1974).

II.

As an initial matter, the government argued that defendant's motion should be denied as untimely, noting that motions pertaining to defendant's drug conspiracy charge in the initial indictment were due on November 20, 2014. *See* Minute Entry, Arraignment (Doc. 25). On November 20, defendant, by counsel, complied with this directive by filing a motion to dismiss and a motion for a bill of particulars, but at that time did not file a motion to suppress any evidence pertaining to the October 10, 2010 search and arrest. Following the return of a

Superseding Indictment adding the firearms charge, a new order issued setting January 15, 2015 as the deadline for "[a]ny additional pretrial motions pertaining specifically to the new firearms charge included in the superseding indictment." *United States v. Samuel*, 1:14cr351 (E.D. Va. Dec. 19, 2014) (Order). Thereafter, new, more experienced counsel was appointed and the instant motion to suppress was filed on January 15.

Although motions to suppress must be raised in a timely manner, an untimely motion may be considered if the moving party shows good cause. Fed. R. Crim. P. 12(c)(3); *see also United States v. Chavez*, 902 F.2d 259, 263 (4th Cir. 1990). In this respect, courts generally consider (i) the extent of the untimeliness, (ii) the reason for late filing, (iii) prejudice to the other party, and (iv) whether the receipt of additional information after the filing deadline "alerted defendant to facts on which a motion to suppress might be based." *United States v. Cross*, 256 F. App'x 623, 627 (4th Cir. 2007). These factors, applied here, point persuasively to the conclusion that the motion should not be denied as untimely. The extent of the untimeliness was not extreme and the Order issued after the Superseding Indictment was arguably ambiguous as to whether the new motions date applied *only* to the new charge in the indictment. Most importantly, however, no prejudice to the government resulted from the late filing as it was filed well in advance of the scheduled trial.

III.

Analysis of the motion to suppress properly begins with the question whether defendant's stop on October 10, 2010 was "unreasonable" under the Fourth Amendment. U.S. Const. amend. IV (guaranteeing "[t]he right of people to be secure . . . against unreasonable searches and seizures"). If the stop was unreasonable, defendant's motion should be granted and the evidence obtained as a result of his search and seizure should be suppressed as fruit of the poisonous tree.

It is now well-settled that a brief, investigatory stop is reasonable if the detaining officer has "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. at 30 (1968)). The government argues that precisely this occurred here. Defendant, by counsel, disagrees, arguing (i) that he was arrested, not stopped pursuant to *Terry v. Ohio*, and thus that the government must show that the officer had probable cause; and (ii) that even if his detention was a *Terry* stop, Officer Munsterman had neither reasonable suspicion nor probable cause to detain and arrest him.

Defendant's initial contention that "he was effectively under arrest" when Officer Munsterman detained him because she approached him with her gun drawn is not supported by the record. The Fourth Circuit has held that brief detentions do not constitute an arrest "*so long as the methods of restraint used are reasonable to the circumstances.*" *Young v. Prince George's County*, 355 F.3d 751, 755 (4th Cir. 2004) (internal quotation omitted) (emphasis in original). Here, the evidence is clear that the methods of restraint were reasonable in the circumstances and thus that defendant's detention was a *Terry* stop, not an arrest. Neither the fact that Officer Munsterman drove up to defendant's vehicle with her lights on,[2] nor that she approached defendant with her weapon drawn crossed the line to convert defendant's stop into an arrest. The Fourth Circuit has frequently held that police officers may draw their weapons for protection without transforming an otherwise valid *Terry* stop into an arrest. *United States v. Perate*, 719 F.2d 706, 709 (4th Cir. 1983) (holding that police stop was not an arrest even where police vehicles blocked defendant's limousine with their vehicles and "emerged with weapons drawn"); *United States v. Seni*, 662 F.2d 277, 283 (4th Cir. 1981) ("The fact that the officer drew his gun

---

[2] Although defendant's brief asserts that Officer Munsterman drove up to defendant's vehicle "with sirens blaring," no record evidence was presented to support this assertion. Deft.'s Br. at 3. To the contrary, Officer Munsterman credibly testified that her lights were flashing, but that her sirens were not on.

and frisked [defendants] for weapons does not necessarily elevate the stop into an arrest."). Moreover, Officer Munsterman's decision to approach with a weapon drawn was reasonable in the circumstances: Officer Munsterman was alone, in a high crime area, and was responding to a tip that the occupants of defendant's vehicle were distributing illegal narcotics, an activity often associated with the presence of weapons and the threat of violence. In these circumstances, Officer Munsterman's drawing of her weapon was reasonable and her initial detention of defendant did not amount to an arrest.

Because this initial encounter between defendant and Officer Munsterman is appropriately characterized as an investigatory stop, not an arrest, it follows that the Fourth Amendment requires only that the officer have a reasonable suspicion that defendant was engaged in wrongdoing. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). Reasonable suspicion is "something more than an 'inchoate and unparticularized suspicion or hunch'" but something "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* at 7 (quoting *Terry v. Ohio*, 392 U.S. at 27). An officer must have "'a particularized and objective basis for suspecting the person stopped for criminal activity.'" *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The essential question is this: "[W]ould the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Terry v. Ohio*, 392 U.S. at 21-22.

The record convincingly establishes that this standard was met in this case. First, the tip received by MPD and communicated to Officer Munsterman carried sufficient "indicia of reliability" to justify the stop. *Adams v. Williams*, 407 U.S. 143, 148 (1972). The Supreme Court has repeatedly endorsed law enforcement officers' reliance on tips to establish reasonable

suspicion, rejecting the argument "'that reasonable cause for a[n investigative stop] can only be based on the officer's personal observation, rather than on the information supplied by another person.'" *Navarette v. California*, 134 S. Ct. at 1688 (quoting *Adams v. Williams*, 407 U.S. at 147). Whether such information justifies a stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). The tip in the instant case was reliable for several reasons: the caller identified herself by name, was reporting on events at the Exxon station as she observed them, and the caller's description of the vehicle and its placement at the Exxon station matched the scene that Officer Munsterman encountered when she arrived, thereby corroborating the reliability of the tipster's report that the occupants of the vehicle were dealing narcotics. *See Adams v. Williams*, 407 U.S. at 148 (finding a tip reliable where officer "found [a] gun precisely where the informant had predicted" thereby "tend[ing] to corroborate the reliability of the informant's further report of narcotics"); *Alabama v. White*, 496 U.S. at 332 (finding that an anonymous tip had been sufficiently corroborated to furnish reasonable suspicion). In sum, the totality of the circumstances in this case indicate that the caller's report was sufficiently reliable to justify Officer Munsterman's reasonable suspicion that defendant was engaged in wrongdoing.

The reliability of the tip is only strengthened by the fact that the passenger in the vehicle identified by the caller fled as Officer Munsterman approached in her police cruiser. As the Supreme Court has held, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. at 124. "Headlong flight" upon sighting a police officer, particularly in a high crime area, although "not necessarily indicative of

wrongdoing, ... is certainly suggestive of such." *Id.*[3] The passenger's flight both serves to corroborate the tipster's call that the occupants of the vehicle were engaged in illegal activity and generates reasonable suspicion in and of itself.

Defendant argued that because *he* did not flee but instead stayed behind in his car when Officer Munsterman approached, his behavior was inconsistent with that of someone who had committed a crime and therefore could not give rise to reasonable suspicion of wrongdoing. Yet, as is well established, courts must consider the "totality of the circumstances" in ruling on the existence of reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 275 (2002). The totality of the circumstances includes the behavior of defendant's passenger or any other confederate of the defendant. *See, e.g. United States v. Bumpers*, 705 F.3d at 175 (finding reasonable suspicion was established where both defendant and another man with him reacted to the sight of a police officer "by walking away 'at a fast pace'"); *United States v. Branch*, 537 F.3d 328, 338 (4th Cir. 2008) (explaining that nervousness and refusal to make eye contact of both driver *and* passenger during a traffic stop contributed to officer's reasonable suspicion). Further, the fact that defendant's conduct in remaining in the Jeep Cherokee was "ambiguous and susceptible of an innocent explanation" does not establish a violation of the Fourth Amendment. *Illinois v. Wardlow*, 528 U.S. at 125. Ambiguous conduct may give rise to reasonable suspicion, allowing an officer to detain defendant "to resolve the ambiguity." *Id.*

---

[3] *See also Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (holding that "[r]espondent's strange movements in his attempt to evade" police officers supported finding of reasonable suspicion, as well as respondent and his confederates speaking "furtively" to one another, telling others to "get out of here"); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (holding that police officers may consider a driver's behavior in establishing reasonable suspicion to stop a car, such as "erratic driving or obvious attempts to evade officers"); *United States v. Bumpers*, 705 F.3d 168, 175 (4th Cir. 2013) (holding that defendant's "evasive behavior" was another "pertinent factor" contributing to the officer's reasonable suspicion).

9

In the end, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.* The tipster's call accurately describing defendant's vehicle and location and defendant's passenger's flight from police in a high crime neighborhood are sufficient to establish a reasonable, articulable suspicion that defendant was engaged in wrongdoing. Accordingly, defendant's brief investigatory detention prior to his arrest was reasonable under the Fourth Amendment and his motion to suppress on this ground must be denied.

IV.

Nor is there any doubt that this reasonable suspicion ripened into probable cause to justify the search of defendant's vehicle and defendant's eventual arrest. As recited in Part I, *supra*, police searched defendant's vehicle after canine officer Mako, a dog trained and certified in detecting narcotics, "alerted" by scratching at the driver's side door.[4] Under the well-established "automobile exception" to the warrant requirement, officers need only establish probable cause that a "readily mobile" vehicle contains contraband in order to conduct a search of that vehicle. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). Further, an alert by an appropriately trained dog is presumptively reliable to establish probable cause to conduct a search. *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013); *United States v. Green*, 740 F.3d 275, 282 (4th Cir. 2014). Thus, canine Mako's alert at the driver's side door was a reliable indication and provided probable cause that the vehicle contained contraband given his narcotics-detection certification and reported 100 percent performance rate in the field. *See Florida v. Harris*, 133 S. Ct. at 1057 ("[E]vidence of a dog's satisfactory performance in a certification or training

---

[4] It should be noted that "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005); *see also United States v. Green*, 740 F.3d 275, 282 (4th Cir. 2014).

program can itself provide sufficient reason to trust his alert."). Defendant has not disputed the reliability of Mako's alerts generally or of the particular alert in this case and based on the evidence presented there is no reason to believe that Mako's alerts were unreliable. *See id.* at 1058. It is therefore clear that Mako's alert was sufficient to establish probable cause to search the vehicle and thus that the search was consistent with the Fourth Amendment.[5]

Following directly from the lawful search of defendant's vehicle, which led to the discovery of small Ziploc baggies of white powder that field-tested positive for heroin, Officer Munsterman had probable cause to arrest defendant and to conduct a search of his person incident to arrest. *See United States v. Robinson*, 414 U.S. 218, 224 (1973) (holding that when law enforcement officers have probable cause to make a lawful custodial arrest, they may search the arrestee's person incident to that arrest in order to prevent concealment or destruction of evidence). Thus, the search of defendant's vehicle and person were supported by probable cause and were consistent with the Fourth Amendment. To the extent that defendant's motion to suppress is based on the illegality of these searches, the motion must be denied.

V.

In sum, Officer Munsterman possessed reasonable suspicion that defendant was engaged in criminal activity when she temporarily detained him prior to his arrest on October 10, 2010. Further, police officers had probable cause to undertake a search of defendant's vehicle after a certified narcotics detection dog alerted at the driver's side door and had probable cause to arrest defendant after finding baggies containing heroin in his vehicle. Consequently, defendant has

---

[5] It should be noted further that the record shows that the time defendant was detained before the dog sniff was fairly brief—between one and four minutes elapsed from the time Officer Munsterman arrived on the scene and the time Officer McAndrews arrived with Mako.

11

failed to show that this search and seizure was contrary to the Fourth Amendment and his motion to suppress must be denied.

An appropriate Order has already issued.

Alexandria, Virginia
March 26, 2015

/s/
T. S. Ellis, III
United States District Judge